IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DIMITRE ASSENOV,<br><br>                    Plaintiff,<br><br><br><br>          vs.<br><br><br>THE UNIVERSITY OF UTAH, MELINDA P. KRAHENBUHL, DAVID SLAUGHTER, and DOES 1 through 5,<br><br>                    Defendants. | ORDER and MEMORANDUM OPINION<br><br><br><br><br>Case No. 2:05-CV-1030 TC |

Plaintiff Dimitre Assenov has sued the University of Utah (the "University") under Title VI of the Civil Rights Act of 1964, 42 U.S.C.§ 2000d *et seq.*, alleging that he was dismissed from a doctoral program as the result of discrimination based on his race, ethnicity, and national origin.  He also sued Dr. Melinda P. Krahenbuhl and Dr. David Slaughter under 42 U.S.C. §§ 1981, 1983 and 1985 in their individual and official capacities, for denying him equal protection, depriving him of property without due process, and conspiring to violate his civil rights.

Mr. Assenov was a student in the doctoral program of the University of Utah College of Engineering's Nuclear Engineering Program (the "NEP").  Dr. Slaughter was the director of the NEP at the time Mr. Assenov was admitted.  To advance in the NEP, doctoral students are required to pass a Qualifying Exam ("QE") and have two chances to do so.  During his time in the NEP, Mr. Assenov twice refused to take QEs scheduled by Dr. Slaughter, once in February 2004 and once in March 2004.  Mr. Assenov contended at that time that under his understanding

of NEP policy and procedure, he was not required to take those QEs as scheduled.  He further conceded to feeling unprepared on those dates.  According to Defendants, Dr. Slaughter told Mr. Assenov at the time that his refusal to take the QE scheduled for March 2004 was deemed a failure.  Mr. Assenov disputes that Dr. Slaughter told him that.

In late December 2004, Mr. Assenov sat for a QE scheduled by Dr. Krahenbuhl, who had taken over as the NEP's director.  On January 10, 2005, according to Mr. Assenov, Dr. Krahenbuhl told him that she had dismissed him from the NEP as a matter of security.  The next day, Dr. Krahenbuhl sent a letter formally dismissing Mr. Assenov from the NEP.  The letter stated that he was out of the program because he had failed the QE twice.

After receiving the letter, Mr. Assenov sought a leave of absence from the NEP.  When he was refused the leave, Mr. Assenov wrote three letters to various University officials.  In each of his letters, Mr. Assenov objected to his dismissal from the NEP and alleged that discrimination against him based on his race, ethnicity and national origin played a role in his being dismissed.  Of the three letters, the University only responded to the first by directing Mr. Assenov to the student code's academic appeals process.  When he did not receive what he considered an adequate response to his complaints, Mr. Assenov filed the present action.

Now before the court are a motion by the Defendants to grant summary judgment in their favor on all claims except that for equal protection and several related motions.  Because Mr. Assenov has identified factual disputes going to some, but not all of his claims, Defendants' summary judgment motion is DENIED in part and GRANTED in part.  All of the related motions are also DENIED.

## **FACTUAL BACKGROUND**

Mr. Assenov was accepted into the NEP's Ph.D. program in February 2001.  Initially, his advisor in the program was Dr. Slaughter, who was the director of the NEP at the time Mr. Assenov first enrolled.  Mr. Assenov also took courses from Dr. Krahenbuhl during his time in the program.  Mr. Assenov took and passed several courses while in the NEP, though he apparently failed others because he did not finish the course work.

In January 2004, Dr. Slaughter scheduled Mr. Assenov to take the QE.  The QE consists of five modules and is designed to demonstrate capacity in engineering, independent thinking and academic potential.  The parties dispute whether study or attendance of NEP courses is helpful to passing the QE.  Passing the QE was one of the requirements for a student's continued participation in the NEP's doctoral program.  Under NEP policy, students are allowed two chances to pass the QE.  Dr. Slaughter was to proctor the QE, and he set the date for February 25-27, 2004.

Mr. Assenov was unwilling to take the QE at that time because he did not feel prepared for the exam.  He further understood that under NEP policy and procedure, certain other steps were needed before scheduling a QE, such as consulting with him about the subjects and scheduling of the exam and forming a supervisory committee.  Mr. Assenov therefore did not sit for the QE scheduled in February 2004.

On February 25, 2004, Dr. Slaughter sent Mr. Assenov an email rescheduling the QE for March 3-5, 2004.  In that email, Dr. Slaughter stated that "[t]he serious consequences of not appearing for the examination on its rescheduled dates without notice means that you will automatically be given a failing grade on the PhD Qualifying Exam and you would then only have one more attempt to take the exam."  (Ex. F to Second Assenov Aff.)  Dr. Slaughter further

3

instructed Mr. Assenov to contact him personally by March 2, 2004, if Mr. Assenov could not take the QE on the scheduled date.  (See id.)

Mr. Assenov continued to feel unprepared to take the QE.  He also still believed that the QE was being scheduled contrary to NEP policy and procedure.  Rather than speak immediately to Dr. Slaughter about the rescheduled date of the QE, however, Mr. Assenov contacted the dean of the University's graduate school.  The dean referred Mr. Assenov to Dr. Evert Lawton, Director of Graduate Studies at the University of Utah College of Engineering's Department of Civil and Environmental Engineering.  (The NEP is a subset of that department.)  After Mr. Assenov told Dr. Lawton of his objections to taking the QE on March 3-5, Dr. Lawton advised Mr. Assenov to let Dr. Slaughter know in person that he did not intend to take the QE on the scheduled dates.  Mr. Assenov spoke and gave a letter to Dr. Slaughter on March 2 to that effect. (See Second Assenov Aff. ¶ 38.)

As planned, Mr. Assenov did not appear for the QE on March 3, 2004.  Instead, on that day, Mr. Assenov met with Dr. Lawton, Dr. Slaughter and Ezra Christiansen, a student representative.  There is conflicting evidence about what happened at that meeting.  Mr. Assenov states that he was not informed that his refusal to take the QE resulted in his being deemed to have failed it.  (See id. at ¶ 45.)  Rather, Mr. Assenov asserts that he was told he did not have to take the QE and he could take it later that year.  (See id.[1])  Mr. Christiansen submitted an affidavit stating that the discussion at the meeting centered on what was expected of Mr. Assenov when he took the first QE.  (See Christiansen Decl. ¶ 2, attached as Ex. 4 to Pl.'s Mem. in Opp'n.)  Dr. Slaughter, on the other hand, testified that he did tell Mr. Assenov during that

---

[1]Defendants move to strike this portion of Paragraph 45 as hearsay, but the court will consider the statements contained therein as party admissions.

meeting that he had failed the QE.  (See Slaughter Dep. at 127-130, attached as Ex. B to Defs.'
Mem. in Supp.)  For his part, Dr. Lawton does not recall the meeting's details.  (See Lawton
Dep. at 35, attached as Ex. F to Defs.' Mem. in Supp.)

Also on March 3, 2004, Dr. Lawton sent an email to Mr. Assenov stating that "[y]ou do
not have to take the Qualifying Exam at this time."  (Ex. K to Second Assenov Aff.[2])  Defendants
do not dispute that Dr. Lawton sent Mr. Assenov this email, but they do state that Dr. Lawton did
not have any authority to change the terms of Dr. Slaughter's February 25 email.

Dr. Krahenbuhl became director of the NEP in July 2004.  In a July 28, 2004 email, she
told Mr. Assenov that he was not allowed to take 7000-level courses because he "chose not to
take the qualifying exam last semester."  (Ex. L to Second Assenov Aff.)  She did not inform him
in that email that he had failed the March QE.

Mr. Assenov states that between July and December 2004 Dr. Krahenbuhl refused several
times to meet with him about the QE.  He also asserts that he was not allowed to register for NEP
classes in that time period.  On December 2, 2004, Dr. Krahenbuhl notified Mr. Assenov that a
QE had been scheduled for December 27-29, 2004.  Mr. Assenov then  met with Dr. Krahenbuhl
about what to expect at the QE.  He maintains that during this meeting, Dr. Krahenbuhl was
"generally uncooperative" in helping him prepare for the QE.  (Second Assenov Aff. ¶ 51.[3])  Mr.
Assenov took the December 27-29 QE at the scheduled time.

On January 10, 2005, Mr. Assenov asked Dr. Krahenbuhl about his QE results. (See

---

[2]Defendants move to strike Exhibit K as hearsay, but the court considers it as a party
admission.

[3]Defendants move to strike Mr. Assenov's account of this meeting to the extent that it
implies discriminatory intent by Dr. Krahenbuhl.  The court does not find merit in this objection
and will consider Mr. Assenov's contention.

Second Assenov Aff. ¶ 55.[4])   According to Mr. Assenov, Dr. Krahenbuhl told him that she had only reviewed two of his five answers on the QE.  (See id.)  He then asked her for a PIN number for a class.  (See id.)  (Students must have PIN numbers to register for NEP courses.)  She then angrily told him that she had suspended his ID card and dismissed him from the NEP, telling him that  "this is a nuclear engineering program" and "it is a matter of security."  (Id.)

The next day, January 11, 2005, Dr. Krahenbuhl sent Mr. Assenov a letter.  In that letter, Dr. Krahenbuhl informed Mr. Assenov that because he had failed the QE twice, he was no longer a doctoral candidate in the NEP.  (See Ex. N to Second Assenov Aff.)  After receiving this letter, Mr. Assenov requested a leave of absence from the NEP.  In a January 25, 2005 letter signed by Dr. Krahenbuhl's administrative assistant, Susan Sperry, Mr. Assenov was denied leave because, among other things, he was no longer in the NEP.  (See Ex. O to Second Assenov Aff.)

On February 17, 2005, Mr. Assenov sent a letter addressed to the dean of the University's College of Engineering, of which the NEP is a part.  Mr. Assenov sent copies of the letter to the chair of the College's Department of Civil and Environmental Engineering, the dean of the University's graduate school, the University's vice president and associate vice president of student affairs, the University's director of student advocacy, and the University's vice president of diversity.  (Second Assenov Aff. ¶ 60.[5])  In his letter, Mr. Assenov complained about his dismissal from the NEP and described various events leading up to his dismissal and alleged misconduct, including "[b]arriers and discrimination in my academic endeavors as a foreign

---

[4]Defendants move to strike Mr. Assenov's account of this conversation to the extent that it implies discriminatory intent by Dr. Krahenbuhl.  The court does not find this objection to be well taken and considers her statements to Mr. Assenov as party admissions.

[5]Defendants move to strike Mr. Assenov's list of the individuals to whom he sent copies of the letter as lacking foundation, but Mr. Assenov would have knowledge of that fact.

student." (Ex. P to Second Assenov Aff.)  He wrote, "I hope that the enclosed evidence will help you to understand the kind of discrimination and pressure I have been subject to while attempting to complete my studies at the University of Utah."  (Id.)

On March 1, 2005, Mr. Assenov received a letter from Dana Robison, a University academic coordinator, notifying Mr. Assenov that under the University Student Code's grievance procedure, Mr. Assenov was required to contact Dr. Krahenbuhl as the first step in resolving his complaint.  (See Ex. R to Second Assenov Aff.)  After receiving her letter, Mr. Assenov spoke personally to Ms. Robison and told her that he did not think he should have to begin the process by contacting Dr. Krahenbuhl "due to the way she had treated" him.  (Second Assenov Aff. ¶ 66.)  He also told Ms. Robinson he did not consider his complaint to be an "academic appeal." (Id.)  Mr. Assenov did not hear anything from Ms. Robison after that meeting.  (See id.)

On March 22, 2005, Mr. Assenov wrote another letter, this time to the University's senior vice-president of academic affairs.  He sent copies of the letter to many of the same recipients of his February 17 letter.[6]  In the March 22 letter, Mr. Assenov reiterated his complaints about his treatment and dismissal from the NEP.  (See Ex. S to Second Assenov Aff.)  Mr. Assenov alleged that discrimination played a role in his dismissal and asserted that Dr. Krahenbuhl had created "false information" against him.  (Id.)  Mr. Assenov then asserted that  "Federal Law prohibits the use of such [false] information to limit or discriminate against a person's rights based on his ethnicity, race or background."  (Id.)

When he received no response to that letter, Mr. Assenov sent a third letter, this time to the University's president, on April 25, 2005.  That letter repeated the claims of the earlier

_____

[6]Defendants move to strike Mr. Assenov's list of the persons to whom he sent copies of the letter as lacking foundation, but Mr. Assenov would be familiar with this fact.

letters, including that Mr. Assenov faced discrimination based on his "ethnicity, race or background."  (Ex. T to Second Assenov Aff.)  The record does not reflect that anyone from the University responded or otherwise acted upon Mr. Assenov's letters of March 22 or April 25.[7]

**Procedural History**

On November 4, 2005, Mr. Assenov filed the present action against Defendants in Utah state court.  In his complaint, Mr. Assenov asserted four causes of action.  First, he asserted a claim under 42 U.S.C. § 1983 for alleged violations of his equal protection and due process rights.  Second, he claimed a violation of 42 U.S.C. § 1981, asserting that he was subject to discrimination based on his "race and/or national origin."  (Compl. ¶ 43.)  Third, he claimed a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"), contending that Defendants discriminated against him based on his race and national origin.  Fourth, he claimed a violation of 42 U.S.C. § 1985(3), based on an alleged conspiracy to deprive him of equal protection.  The complaint seeks injunctive and monetary relief, including an order reinstating him in the NEP program.

Defendants removed the action to this court on December 12, 2005, invoking federal question jurisdiction. After removal, the parties completed extensive discovery.  In June 2007, Defendants moved for partial summary judgment and judgment on the pleadings.  The primary basis for Defendants' partial summary judgment motion was that Dr. Krahenbuhl and Dr.

---

[7]In his summary judgment response, Mr. Assenov attached what he claims is the University's discrimination policy at the time of his dismissal and asserts that it applies to his situation.  (See Second Assenov Aff. ¶ 64; Ex. Q to Second Assenov Aff.)  Defendants object to the introduction of this policy as hearsay.  While the court would consider the University's applicable discrimination policy as a party admission here, it is not clear that the policy attached by Mr. Assenov applies to graduate students.  Instead, the policy appears to apply only to University employees.  (See Ex. Q to Second Assenov Aff.)  Since Mr. Assenov has not established that the discrimination policy he attaches and quotes applies to students, the court will not consider it here.

Slaughter did not deprive Mr. Assenov of any protected property interest, and even if they did, they are entitled to qualified immunity.  (Defendants did not seek summary judgment on Mr. Assenov's equal protection claim.)

Defendants made several arguments in support of their motion for a judgment on the pleadings.  They argued that Dr. Krahenbuhl and Dr. Slaughter could not be sued in their official capacities under §§ 1981, 1983, or Title VI.  They further argued that the University could not be vicariously liable under Title VI.  Finally, they contended that Mr. Assenov's § 1981 claim should have been brought under § 1983 and was therefore invalid.

On October 1, 2007, a hearing was held on Defendants' motions.  At that hearing, Mr. Assenov clarified the exact nature of his claims and against whom he is making them.  First, Mr. Assenov stated that his § 1983 claim is brought against Drs. Krahenbuhl and Slaughter in their individual capacities for damages and in their official capacities for injunctive relief.  Second, Mr. Assenov clarified that the due process component of his § 1983 claim is for procedural due process, as opposed to substantive due process.[8]  (The parties did not address Mr. Assenov's equal protection claim at the hearing.)  Third, Mr. Assenov stated that his § 1981 claim is also against Dr. Krahenbuhl and Dr. Slaughter in their individual capacities for damages and in their official capacities for injunctive relief.  Fourth, Mr. Assenov stated that his Title VI claim is against the University only.  Finally, Mr. Assenov stated that his § 1985(3) claim is against Dr. Krahenbuhl and Dr. Slaughter in their individual capacities. At the close of the hearing, the court dismissed Defendants' partial motion for summary judgment without prejudice and denied their motion for judgment on the pleadings.

---

[8]Mr. Assenov later sought to be allowed to proceed on a substantive due process theory as well, but the court denied this request, finding that Mr. Assenov had irreversibly limited his due process claim to one for procedural due process at the October 1 hearing.

On November 15, 2007, Defendants again moved for summary judgment on the claims Mr. Assenov discussed at the October 1, 2007 hearing.  (As in their first motion, Defendants did not expressly move for summary judgment on Mr. Assenov's equal protection claim.)  Following Defendants' motion, the parties engaged in a flurry of motions and briefing related to summary judgment and related evidentiary proffers.  Now before the court are the following motions:

- Defendants' Motion for Summary Judgment (Dkt. No. 124);

- Plaintiff's Motions to Strike Portions of the Affidavits of Dr. Slaughter and Dr. Krahenbuhl (Dkt. Nos. 129 and 130);

- Plaintiff's Motion to Strike Defendants' Motion for Summary Judgment (Dkt. No. 131);

-  Defendants' Motion to Strike Portions of Mr. Assenov's Second Affidavit (Dkt. No. 164);

- Plaintiff's Motion to Strike Defendants' Motion to Strike (Dkt. No. 173); and

- Plaintiff's Motion to Strike Defendants' Second Errata (Dkt. No. 181).

The court will not address every argument made in the parties' motions to strike because the parties identified relatively few material facts.[9]  Instead, relevant objections to certain pieces

---

[9]Because granting Mr. Assenov's motion to strike Defendants' motion for summary judgment would moot any analysis and result in the survival of all of Mr. Assenov's claims, the court will briefly address Mr. Assenov's arguments in favor of that motion.  First, Mr. Assenov contends that the court dismissed with prejudice some of Defendants' arguments, precluding them here.  That is not so.  The record is clear that the court only dismissed with prejudice Defendants' motion for a judgment on the pleadings to the extent that it was based on facts outside the pleadings.  This ruling does not prevent Defendants from reasserting factual and legal propositions they made previously.  Second, Mr. Assenov argues that Defendants' statement of undisputed facts in their supporting memorandum contains disputed facts.  This is a run-of-the mill occurrence in summary judgment briefing and simply requires the court to decide what issues are actually in dispute.  It is not grounds for striking the summary judgment motion. Finally, Mr. Assenov identifies various factual assertions that he believes should be stricken for lack of evidentiary support.  Even Mr. Assenov's arguments are correct respecting various asserted facts, that is not a reason to strike the entire motion.  Mr. Assenov's motion to strike (Dkt. No. 131) is accordingly DENIED.

of evidence which raise disputed factual questions are addressed throughout this opinion as they arise.

## ANALYSIS

### Summary Judgment Standard

"Summary judgment is proper if the evidence submitted by the parties, viewed in the light most favorable to the non-movant, indicates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Faustin v. City & County of Denver, Colo., 423 F.3d 1192, 1198 (10th Cir. 2005) (citations and internal quotation marks omitted). See also Fed R. Civ. P. 56(c). "A 'material fact' is one which could have an impact on the outcome of the lawsuit, while a 'genuine issue' of such a material fact exists if a rational jury could find in favor of the non-moving party based on the evidence presented." Chasteen v. UNISIA JECS Corp., 216 F.3d 1212, 1216 (10th Cir. 2000). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### I.   Mr. Assenov's § 1983 Claim

Mr. Assenov's first claim is for a violation of his Fourteenth Amendment right to procedural due process, brought under 42 U.S.C. § 1983. "Procedural due process ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision." Kirkland v. St. Vrain Valley Sch. Dist. No. Re-1J, 464 F.3d 1182, 1189 (10th Cir. 2006) (citation omitted). Courts follow a two-step inquiry to evaluate procedural due process claims: "(1) Did the individual possess a protected interest to which due process protection was applicable? (2) Was the individual afforded an appropriate level of process?" Id.

11

(citation omitted).

### A.      Property Interest

The parties correctly agree that Mr. Assenov's continued enrollment in the NEP is a property interest entitled to constitutional due process protections.  See Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172, 1181 (10th Cir. 2001).  Mr. Assenov further asserts, without citing any authority, that he had a property interest in taking the QE a second time.  While the court is not presently convinced that taking the QE is a property right, it will not resolve this question here because the facts surrounding Mr. Assenov's ability to take the QE largely overlap with his status in the NEP.

### B.      Appropriate Level of Process

Having established that Mr. Assenov had a property right in NEP enrollment, the court next determines two questions.  First, what level of process should Mr. Assenov have been afforded relating to his dismissal?  Second, is there a factual dispute as to whether he received it?  Defendants contend that Mr. Assenov was not entitled to any process before he was dismissed from the NEP.  They argue that the University's post-dismissal academic appeals process was adequate to protect Mr. Assenov's rights.

Mr. Assenov counters that several United States Supreme Court and Tenth Circuit opinions require that a graduate student must always be afforded some process before being dismissed.  He asserts that a factual dispute exists as to whether he was afforded such process.  In the alternative, even if there is no general rule requiring prior process for students, Mr. Assenov asserts he had a right to pre-dismissal procedures under general due process principles, and that he was denied such process.

To leave no doubt on this issue, the court will first consider authority specifically relating

to pre-dismissal due process in the academic context.  Following that, the court will analyze this motion using general procedural due process principles.  As explained below, the result is the same under either method.

### 1.        Process Due to Students Before Dismissal

It appears that Mr. Assenov is correct that as a general rule, graduate students are due some process before they are dismissed.  The cases located by the parties and the court involving the dismissal of students, including graduate students, almost all deal only with the question of what kind of process is due a student before dismissal  See, e.g., Goss v. Lopez, 419 U.S. 565, 581 (1975) (discussing procedures due high school students before suspension); Board of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 88-90 (1978) (discussing process due to medical student before dismissal); Trotter v. Regents of Univ. of N. M., 219 F.3d 1179, 1185 (10th Cir. 2000) (same); Gossett, 245 F.3d at 1178 (same for nursing student).  Implicit in these cases is that post-dismissal procedure alone is not constitutionally sufficient.  Consequently, the only questions that appear relevant here are the nature of the process Mr. Assenov was due before his dismissal from the NEP and if a fact question exists as to whether Dr. Krahenbuhl and Dr. Slaughter afforded him such process.

Assuming that pre-dismissal process is always due, the types of process due are clear.  If the dismissal is based on academic-related reasons only, the process due to the student is minimal: the student is entitled to notice that his or her performance has not been satisfactory and to a careful and deliberate decision.  See  Trotter, 219 F.3d at 1185.  This standard is intentionally low and purposely leaves out a hearing requirement because courts are reluctant to interfere in the educational process or to second guess an educator's expert judgment on academic matters.  See  Horowitz, 435 U.S. at 88-90.

By contrast, if a dismissal is based on disciplinary reasons, the student should receive both notice and a hearing before the dismissal.  See Goss, 419 U.S. at 581.  The notice and hearing need not necessarily be formal, but should be commensurate with the circumstances and severity of the situation.  See id. at 581-84.[10]

Defendants assert that Mr. Assenov's dismissal was purely academic in nature.  If this was so, Mr. Assenov was entitled only to prior notice that he was failing and a careful and deliberate decision by Dr. Krahenbuhl.  Even if Defendants are correct, Mr. Assenov has raised a factual dispute as to whether he was provided these less stringent requirements.

First, Mr. Assenov has raised a fact question regarding when he got notice of his deficient performance.  As the directors of the NEP and administrators of the QE, Dr. Slaughter and Dr. Krahenbuhl arguably had the duty to tell Mr. Assenov, in a timely fashion, that he had failed the QEs.  According to Mr. Assenov, however, he only found out that he had failed the QEs on January 11, 2005, at the same time he was told he was no longer in the NEP.  If this is true, it could provide the basis for a holding that Dr. Slaughter and Dr. Krahenbuhl did not give Mr. Assenov sufficient notice of his failures.

Defendants argue that Mr. Assenov did have timely notice that he had failed the first QE.

---

[10]Defendants cite an unpublished Fifth Circuit case, Clarke v. Univ. of N. Tex., 993 F.2d 1544, *3 (5th Cir. 1993) (table opinion), for the proposition that Goss should not apply to graduate students.  Defendants are correct that Clarke distinguished Goss's urgency of avoiding an unwarranted suspension of a high school student from the less time-sensitive context of suspending a doctoral student.  Clarke purposely stopped short, however, of stating that doctoral students are generally entitled to less pre-suspension process than high school students, or that doctoral students have no right to pre-suspension process.  See id.  Moreover, Clarke is a special case, as it involved university officials immediately blocking a graduate student from enrolling in courses after the officials found out that the student had been arrested for burglary and sexual assault of other students.  See id at *2.  A university's overwhelming interest in moving quickly and dispensing with pre-suspension notice in that situation is obvious.  See id. at *4.  As such, the court does not find Clarke to be persuasive here.  See also Horowitz, 435 U.S. at 90 (discussing Goss in context of process potentially due to medical student).

Specifically, Defendants repeatedly cite Dr. Slaughter's February 25 email as notice to Mr. Assenov that not taking the March QE would be an automatic failure.  But Mr. Assenov has created a factual issue as to whether that is so.  First, Dr. Slaughter's email stated that Mr. Assenov would fail the March QE if he failed to appear "without notice."  (Ex. F to Second Assenov Aff.)  Mr. Assenov has stated that he delivered a letter to and met with Dr. Slaughter on March 2.  A reasonable fact-finder could find that Dr. Slaughter's email was insufficient to put Mr. Assenov on notice that he had failed the March QE, given that Mr. Assenov has shown that he gave Dr. Slaughter notice that he would not appear.

Moreover, events surrounding the March 3 meeting of Dr. Lawton, Mr. Christiansen, Dr. Slaughter and Mr. Assenov call into doubt whether Mr. Assenov was given notice that he had failed the QE at that time.   The statements of Mr. Assenov and Mr. Christiansen could lead a fact-finder to conclude that Mr. Assenov was not informed that he had failed the March QE at that meeting.  Further, following the meeting, Dr. Lawton wrote an email to Mr. Assenov stating that Mr. Assenov did "not have to take the Qualifying Exam at this time."  (Ex. K to Second Assenov Aff.)  Based on those facts, a reasonable person could decide that Mr. Assenov was not informed that he had failed the March QE at the March 3 meeting, and that Dr. Slaughter had thus failed to provide Mr. Assenov with notice that his performance was unsatisfactory.

Turning to Dr. Krahenbuhl's duty to notify Mr. Assenov of his academic deficiencies, she did inform Mr. Assenov that he would not be allowed to take 7000-level courses because he had not attended the March QE.  But Defendants pointed to no evidence that Dr. Krahenbuhl informed Mr. Assenov that he had failed the March QE until she sent him the January 11, 2005 letter, which also informed him of his dismissal.  As for the December QE, Mr. Assenov submitted evidence that Dr. Krahenbuhl did not tell him that he had not passed that exam until

she told him that he was out of the NEP by way of her January 11, 2005 letter.

In sum, Mr. Assenov has pointed to facts suggesting that he did not know that he had failed either QE until he had already been dismissed from the NEP.  Accordingly, Mr. Assenov has raised a material issue of fact precluding summary judgment.

In addition to this fact question on notice, Mr. Assenov has cited evidence that calls into question whether Dr. Krahenbuhl's decision to dismiss him was careful and deliberate.  First, Mr. Assenov asserts that Dr. Krahenbuhl was motivated by prejudice in her decision to dismiss him. As explained by the Tenth Circuit, "the notion of judicial deference to academic decisions loses force when, as here, the decision[]maker is 'accused of concealing non[-]academic or constitutionally impermissible reason' for its action."  Gossett, 245 F.3d at 1181 (quoting Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985)).  As discussed in more detail below, Mr. Assenov has raised a fact issue on whether Dr. Krahenbuhl's's decision to dismiss him was tainted by discrimination based on his ethnicity and national origin.  If that is so, Dr. Krahenbuhl could be found liable for a denial of procedural due process.  See Gossett, 245 F.3d at 1181 (reversing summary judgment against plaintiff on procedural due process claim where plaintiff had "raised a fact issue as to whether the decision to require his withdrawal [from a nursing program] was the result of impermissible gender discrimination rather than a careful and deliberate evaluation of his academic ability") (footnote omitted).

Further, according to Mr. Assenov, on January 10, 2005, Dr. Krahenbuhl admitted to grading only two of five modules on his December QE.  (See Second Assenov Aff. ¶ 55.)  If that is true, it raises a fact question about whether the decision that Mr. Assenov had failed the December QE, apparently made the following day, was careful and deliberate.

Moreover, Mr. Assenov has submitted a March 3, 2004 email by Dr. Lawton stating

16

"[y]ou do not have to take the Qualifying Exam at this time."  (Ex. K to Second Assenov Aff.)
Even if Dr. Lawton did not have actual authority to make any decisions or declarations regarding
the QE, a reasonable fact-finder could look at this email and conclude that someone with
apparent authority at the University had excused Mr. Assenov's refusal to appear at the March
QE.  Accordingly, it could be found to be less than careful and deliberate to base Mr. Assenov's
dismissal partially on Mr. Assenov's failing the March QE.

Additionally, the Defendants have not produced any contemporaneous evidence showing
that anyone in the NEP officially recorded Mr. Assenov's refusal to take the March QE as a
failure.  Dr. Krahenbuhl's decision to base Mr. Assenov's dismissal on such a failure could thus
be seen as a *post hoc* justification and not a reflection of Mr. Assenov's academic performance.

Finally, Dr. Krahenbuhl's decision to dismiss Mr. Assenov on the basis of failing the QE
twice is difficult to characterize as an entirely academic decision.  Mr. Assenov's failure of the
December 2004 QE was, at least on its face, academic in nature.  But it is hard to see Mr.
Assenov's refusal to show up to the March QE as a reflection of his academic performance or his
potential success as a nuclear engineer.  Compare Horowitz, 435 U.S. at 91 n.6 (decision to
dismiss medical student in part due to concerns over personal hygiene "academic" because
hygiene is related to professional competence as a physician.)  If Mr. Assenov was being
dismissed in part as discipline for not showing up to the March QE, he should have been given at
least an informal hearing to explain himself.  See Goss, 419 U.S. at 581.  The record does not
reflect that Dr. Krahenbuhl or anyone else gave him such a hearing.

In conclusion, under relevant authority on process due to students facing dismissal, it
would be improper to grant summary judgment in favor of either individual Defendant.  Neither
Dr. Slaughter nor Dr. Krahenbuhl appeared to give Mr. Assenov timely notice of his failure of

the March QE or December QE, and there is a question as to whether Dr. Krahenbuhl's decision to dismiss Mr. Assenov was careful and deliberate.  Particularly of note is the unresolved issue of whether discrimination played a role in Dr. Krahenbuhl's decision.  If it is found that the decision to dismiss was non-academic, it does not appear that Mr. Assenov had any sort of hearing before his dismissal from the NEP.

In light of the above, Mr. Assenov's procedural due process claim against the individual Defendants survives summary judgment based on authority specific to pre-dismissal process for students. As discussed further below, the court reaches the same conclusion when it applies general procedural due process principles to this case.

### 2.        General Procedural Due Process Principles

Defendants argue that there is no rule in favor of graduate students receiving pre-dismissal process.  They further contend that in this case, the availability of the University's post-dismissal academic appeals process made pre-dismissal process for Mr. Assenov unnecessary, and that Mr. Assenov waived his due process claim by not following that appeals process.

Defendants' position is not entirely without merit.  As explained, the court reads certain cases as implying a rule that pre-dismissal process is always due students.  The court also acknowledges, however, that due process is a flexible concept.  Given this flexibility, "there are some situations in which a post[-]deprivation hearing will satisfy due process requirements." Kirkland, 464 F.3d at 1187. The court found one case from the Eleventh Circuit, Watts v. Florida Int'l Univ., 495 F.3d 1289, 1294 (11th Cir. 2007), holding that because a university made available post-dismissal procedures to a student, a procedural due process claim based on lack of pre-dismissal procedure was precluded.  Additionally, there are many cases outside of the

18

academic context where courts have found that post-deprivation process was all that a plaintiff was due.  To ensure that the issue of procedural due process is fully considered, then, the court analyzes Mr. Assenov's claim using the general framework laid out in cases such as  Kirkland.

There are two key questions in analyzing whether Mr. Assenov has created a fact issue as to whether he was denied adequate procedure.  First, was he constitutionally entitled to process before he was dismissed from the NEP?  This question is significant because Defendants have correctly argued that if post-deprivation process was all Mr. Assenov was due here, Mr. Assenov has not presented any facts suggesting that Dr. Krahenbuhl or Dr. Slaughter had any responsibility or ability to provide Mr. Assenov with such procedure.  Nor has Mr. Assenov shown that either of them interfered with any post-deprivation process he may have been due. Second, if Mr. Assenov was due some process before his dismissal, what should that process have entailed and is there a dispute about whether he received it?

To determine what process is due, the Tenth Circuit balances several factors: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." Kirkland, 464 F.3d at 1187 (quoting Gilbert v. Homar, 520 U.S. 924, 931-32 (1997)).  Not surprisingly, both sides argue that the Kirkland factors support their arguments.

Turning to the first factor, it is clear that the interest in pursuing a doctoral degree is a weighty one.  In this case especially, Mr. Assenov had spent a great deal of time, effort, and money pursuing his studies in the NEP.  (See Second Assenov Aff. ¶ 74.)  Weighing this factor here indicates a need for careful and more formal process, preferably before deprivation.

The second factor is risk of an erroneous deprivation under the process used.  In this case,

it appears that allowing the NEP director the unfettered ability to dismiss a doctoral student without prior notice of his failure and without giving him an opportunity to argue his position presents a good deal of risk and could foreseeably lead to mistakes. Here especially, the record raises a question of whether Dr. Krahenbuhl had some animus against Mr. Assenov, whether for personal, academic, or discriminatory reasons. This factor tilts toward pre-dismissal process for Mr. Assenov.

The next part of the test is to consider the value of additional or substitute procedures. Defendants contend that Mr. Assenov's rights were fully protected by the University's academic appeals procedure. Certainly, Mr. Assenov could have started that process immediately after his dismissal. But Defendants have not shown any facts demonstrating that the University's appeals process functions efficiently or effectively. Moreover, it seems that once a program director has decided that a student failed, that student could be facing an uphill battle in convincing University officials otherwise. Finally, the Defendants have not shown that the academic appeals process had any competence in dealing with allegations of discrimination based on race, ethnicity, or national origin. Consequently, it is does not appear that these procedures would be enough alone to protect Mr. Assenov's enrollment interest.

Lastly, the Defendants do not point to any governmental interest that justifies dismissing Mr. Assenov without prior process. Pre-deprivation process is most commonly denied when there is some tangible need to make a quick decision. See, e.g., Kirkland, 464 F.3d at 1193-94 (no due process violation to suspend teacher with no prior notice during financial emergency); Clarke, 993 F.2d 1544, *4 (same for student suspended with no notice after being arrested for serious crimes). Defendants have not shown any facts that establish beyond question that Mr. Assenov had to be dismissed quickly. Nor have they shown that it would be unduly burdensome

or otherwise impractical to provide students with some form of process, even if limited to notice and an informal hearing, before they are dismissed.

Based on these considerations, it appears that Mr. Assenov was constitutionally due some process before being dismissed.  It is not difficult to find that such process should have included at least notice that he had failed the QEs and some opportunity to argue why the March QE should not have counted as a failure.  As discussed above, Mr. Assenov has presented facts that raise questions about whether he was given such process.

In sum, the court finds that Mr. Assenov's procedural due process claim may proceed against both individual Defendants.  The court's legal analysis indicates that Mr. Assenov was constitutionally entitled to process before he was dismissed from the NEP, that Dr. Krahenbuhl and Dr. Slaughter were in a position to provide it, and that there is a genuine fact dispute about whether they did so.

## II.   Mr. Assenov's § 1981 Claim

Preliminarily, the court notes Defendants' argument that Mr. Assenov waived his claim under 42 U.S.C. § 1981 by not specifically alleging in his complaint that it was brought under § 1983.  But Mr. Assenov did incorporate his § 1983 allegations into his § 1981 claim.  (See Compl. ¶¶ 42-43).  Doing so preserved his § 1981 claim.  See Bolden v. City of Topeka, 441 F.3d 1129, 1134-37 (10th Cir. 2006) (noting that dismissing § 1981 claim on technical grounds is disfavored, pointing out plaintiff's incorporation of § 1983 allegations in his § 1981 claim as support for not dismissing § 1981 claim).

Turning to the merits of Mr. Assenov's § 1981 claim, Mr. Assenov must prove "(1) that the plaintiff is a member of a protected class; (2) that the defendant had the intent to discriminate on the basis of race; and (3) that the discrimination interfered with a protected activity as defined

in § 1981." Hampton v. Dillard Dept. Stores, Inc., 247 F.3d 1091, 1102 (10th Cir. 2001).

"These elements 'are flexible and are not to be applied rigidly.'" Id. (citation omitted). Among

the activities protected by § 1981 is the right to "make and enforce" contracts. 42 U.S.C. §

1981(a). "Make and enforce contracts" is defined as the "making, performance, modification,

and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions

of the contractual relationship." 42 U.S.C. § 1981(b).

As to the first element, Mr. Assenov has shown that he is an ethnic Slav.[11] An ethnic

group qualifies as a protected class. See Saint Francis Coll. v. Al-Kharzaji, 481 U.S. 604, 613

(1987) ("Based on the history of § 1981, we have little trouble in concluding that Congress

intended to protect from discrimination identifiable classes of persons who are subjected to

intentional discrimination solely because of their ancestry or ethnic characteristics.").

Turning to the third element, the court finds that Mr. Assenov's dismissal from the NEP

amounts to a termination of a contract in potential violation of § 1981. See, e.g., Bell v. Ohio

State Univ., 351 F.3d 240, 252 (6th Cir. 2003) (student's enrollment in university was a

contractual right under § 1981); Williams v. Lindenwood Univ., 288 F.3d 349, 357 (8th Cir.

2002) (same). Since Dr. Krahenbuhl decided to terminate Mr. Assenov from the NEP, she could

be liable under § 1981 if Mr. Assenov can prove that her decision to do so was based on racial or

ethnic reasons.[12] (On the other hand, Mr. Assenov has not produced any evidence that Dr.

Slaughter was involved in the decision to dismiss him from the NEP.)

---

[11]As the court noted at the hearing on this motion, the court is not convinced that "Slavic" is only a linguistic group and not an ethnic group. See, e.g., Khachaturyan v. Ashcroft, 86 Fed. Appx. 207, 209 (7th Cir. 2004) (referring to "ethnic Slavs" as a minority group in Kazakhstan).

[12]As for not being allowed by Dr. Krahenbuhl to register for 7000-level courses, Mr. Assenov has not established that he had a contractual right to take those courses before he took the QE. Nor does Mr. Assenov establish that Dr. Krahenbuhl was bound to communicate with him about the QE or the NEP in any particular way.

Defendants contend that there is no evidence that Dr. Krahenbuhl discriminated against Mr. Assenov based on his race or ethnicity in dismissing him from the NEP. They first argue that there is no evidence that Dr. Krahenbuhl knew Mr. Assenov's race or ethnicity. But there is evidence that Dr. Krahenbuhl could likely have known that Mr. Assenov was a Slav. Mr. Assenov is from Bulgaria, has a Slavic surname, and speaks with an accent.

As for discriminatory intent, Dr. Krahenbuhl's administrative assistant, Ms. Sperry, stated that Dr. Krahenbuhl exhibited personal animus against Mr. Assenov. (See Sperry Decl. ¶¶ 2-3, attached as Ex. 5 to Pl.'s Mem. in Opp'n.) Ms. Sperry noted that Dr. Krahenbuhl repeatedly referred to Mr. Assenov as "being from a foreign country." (Id. at ¶ 3.) Moreover, Mr. Assenov states that heard Dr. Krahenbuhl say "I hate Slavs" to Dr. Slaughter after she had returned from a trip to Russia. (Second Assenov Aff. ¶ 22.[13]) The court finds that these facts raise a question as to whether Dr. Krahenbuhl may have had negative feelings against Mr. Assenov because he is a Slav and this could have led her to dismiss him. For these reasons, the court will not grant Defendants summary judgment on Mr. Assenov's § 1981 claim against Dr. Krahenbuhl.

Regarding Dr. Slaughter, Mr. Assenov has pointed to several actions that arguably amount to interference with the implied contract Mr. Assenov had as a student in the NEP. For example, Mr. Assenov points out that Dr. Slaughter barred him from registering from certain classes, refused to respond to his request for an experiment, withdrew prior approval of his dissertation topic, and asked him to surrender his dissertation topic to another student. Mr. Assenov further states that Dr. Slaughter excluded him from the NEP reading room while the

---

[13]Defendants make a circular argument in moving to strike this statement, contending that it should be stricken because it implies that Dr. Krahenbuhl had discriminatory intent, but that there is no evidence of that intent. Defendants cite no authority for striking on such grounds, and the court considers it a party admission.

U.S. Air Force conducted an experiment there because Mr. Assenov was not a U.S. citizen.

The court does not need to decide whether any of Dr. Slaughter's actions amounted to an injury under § 1981, however, because Mr. Assenov has failed to show that Dr. Slaughter had discriminatory intent in taking them.  The only fact conceivably supporting such an inference is that Dr. Slaughter excluded him from the NEP's reading room during a U.S. Air Force experiment for being "foreign born."  (Second Assenov Aff. ¶ 21.)  First, preventing non-citizens from being present during a nuclear-related experiment run by the military is not facially discriminatory.  Even if it were, "Section 1981 does not protect individuals from discrimination based on national origin."  Aramburu v. Boeing Co., 112 F.3d 1398, 1411 n.10 (10th Cir. 1997) (citing St. Francis Coll., 481 U.S. at 613.)  As for the other instances that Mr. Assenov argues prove discriminatory intent, Mr. Assenov conflates negative actions with negative feelings.  While it may be that Dr. Slaughter treated Mr. Assenov poorly, there is no proof that he did so because Mr. Assenov is a Slav.  Accordingly, the court grants summary judgment in favor of Dr. Slaughter on Mr. Assenov's § 1981 claim.

### III.   Mr. Assenov's Title VI Claim

Defendants also seek summary judgment on Mr. Assenov's claim under Title VI against the University.  To show that the University is liable under Title VI, Mr. Assenov needs to demonstrate that an "appropriate person" at the University, that is, someone in a position to implement anti-discrimination measures, had actual notice of the alleged discrimination and did not respond adequately.  See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).  The purpose of this rule is to avoid making institutional defendants liable under Title VI on the basis of *respondeat superior* alone.  See id.

Mr. Assenov does not base his Title VI claim only on Dr. Slaughter's or Dr.

Krahenbuhl's knowledge of the alleged discrimination against him.  Instead, Mr. Assenov has produced three letters to various University officials, up to and including the University's president, in which Mr. Assenov expressly asserted that he felt that he was the victim of discrimination based on his national origin, race, and ethnicity.  There is a reasonable inference to be drawn that at least one of the letters' recipients was in a position take action on these allegations.  Defendants point to no evidence, however, that the University did anything beyond tell Mr. Assenov that he should follow the University's academic appeals process in response to his allegations.  Such a response could be found to be inadequate.  Mr. Assenov's Title VI claim against the University thus survives summary judgment.

## IV.   Mr. Assenov's § 1985(3) Claim

Mr. Assenov asserts that Dr. Krahenbuhl and Dr. Slaughter conspired to deprive him of his equal protection rights in violation of 42 U.S.C. § 1985(3).  "The essential elements of a § 1985(3) claim are: (1) a conspiracy; (2) to deprive plaintiff of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and (4) an injury or deprivation resulting therefrom." Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir. 1993).

Mr. Assenov§ 1985(3) claim fails here for the simple reason that Mr. Assenov has not show any evidence of a conspiracy.  That is, there is no evidence suggesting that Dr. Krahenbuhl and Dr. Slaughter had any agreement to deprive Mr. Assenov of his right to equal protection or acted in concert in any way to do so.  See Babbar v. Ebadi, 216 F.3d 1086, *8 (10th Cir. 2000) ("As to the [§ 1985(3)] conspiracy claim, to survive a motion for summary judgment [plaintiff] must furnish a genuine factual basis to support the existence of the defining elements of a conspiracy-agreement and concerted action.") (citation omitted) (table opinion).  That Dr. Slaughter had some involvement with the QEs or may have discussed the QEs with Dr.

Krahenbuhl before her decision to dismiss Mr. Assenov is not enough alone to imply any agreement between them on anything.  Given this failure, the court finds that summary judgment against Mr. Assenov on his conspiracy claim is appropriate.

## V.   **Other Issues**

Two other issues should be addressed here.  First,  Defendants assert that Mr. Assenov has not shown that the individual defendants have any power to effect the injunctive relief Mr. Assenov seeks, making injunctive claims against them in their official capacities inappropriate. This appears to be true for Dr. Slaughter, who is no longer the NEP's director.  There is a fact question, though, whether Dr. Krahenbuhl's position as director of the NEP would allow her to implement the measures Mr. Assenov seeks.  Accordingly, Mr. Assenov's § 1983 claim against Dr. Slaughter can be made against him only in his individual capacity while Mr. Assenov's claims under §§ 1983 and 1981 against Dr. Krahenbuhl are properly made against her in both her individual and official capacities.

Second, it should be noted that this opinion does not address Mr. Assenov's equal protection claim.  Defendants did not move for summary judgment on that claim, and Mr. Assenov has not waived it despite not mentioning it at the October 1, 2007 hearing. Accordingly, that part of Mr. Assenov's § 1983 claim continues.

## ORDER

For the reasons stated above, the court orders as follows:

Defendants' motion for summary judgment on Mr. Assenov's § 1983 claim based on procedural due process is DENIED as to Dr. Krahenbuhl in her individual and official capacities and as to Dr. Slaughter in his individual capacity and GRANTED as to Dr. Slaughter in his official capacity;

Defendants' motion for summary judgment on Mr. Assenov's § 1981 claim is DENIED with respect to Dr. Krahenbuhl in her individual and official capacities and GRANTED with respect to Dr. Slaughter in his individual and official capacities;

Defendants' motion to for summary judgment on Mr. Assenov's § 1985(3) claim is GRANTED in favor of Dr. Krahenbuhl and Dr. Slaughter in their individual capacities;

Defendants' motion for summary judgment on Mr. Assenov's Title VI claim against the University is DENIED;

Plaintiff's Motions to Strike Portions of Dr. Slaughter and Dr. Krahenbuhl's Affidavits (Dkt. Nos. 129 and 130) are DENIED as moot;

Plaintiff's Motion to Strike Defendants' Motion for Summary Judgment (Dkt. No. 131) is DENIED;

Defendants' Motion to Strike Parts of Mr. Assenov's Second Affidavit (Dkt. No. 164) is DENIED as specifically noted above and as moot;

Plaintiff's Motion to Strike Defendants's Motion to Strike (Dkt. No. 173) is DENIED as moot; and

Plaintiff's Motion to Strike Defendant's Second Errata (Dkt. No. 181) is DENIED as moot.

IT IS SO ORDERED this 21st day of April, 2008.

BY THE COURT:

TENA CAMPBELL
Chief Judge

27